# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DARRELL K. CAMPBELL, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL J. ASTRUE, Commissioner of the ) <br> Social Security Administration, ) <br> ) <br> Defendant. ) | Case No. 10-CV-459-PJC |

## OPINION AND ORDER

Claimant, Darrell K. Campbell, pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Campbell appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Campbell was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**[1]

Campbell was 46 years old on his asserted onset of disability date, January 15, 2004. (R. 15). He completed school through the eleventh grade and did not obtain his GED. (R. 34). Campbell testified at the hearing in front of the ALJ on March 31, 2009, that he was in special education classes during his schooling, but he could read and write. (R. 34-35). He testified that he could only spell small words and had to have his girlfriend read big words to him. (R. 35). Campbell claimed he could add, subtract, and make sure he received the correct change when he was making a purchase, but that he could not balance his checkbook and had to have his girlfriend do this for him. *Id*.

Campbell testified that he had served in the United States Marine Corps., but claimed that he was given the answers to the tests he was required to complete before acceptance. *Id*. While in the Marines, he was a combat engineer and worked with explosives. (R. 35-36). He then worked in the construction industry from 1978 to 2004 as a laborer and carpenter. (R. 36). He testified that he was forced to stop doing construction in 2004 because of back problems, and he did not seek alternative work because he did not know what else he could do. (R. 37-38). At the time of the hearing he had received Veterans Affairs (VA) disability for the previous seven years due to his back and lung problems. *Id*.

---

[1] The general practice of this Court is to summarize the entire medical record of the claimant; however, Campbell raises only one issue before this Court, and the issue is not related to any alleged physical impairments. Plaintiff's Brief, Dkt #22.. Therefore, the Court is following the guidance of counsel as to which parts of the 630-page record relate to Campbell's arguments, and the Court is summarizing only those parts of the record.

Campbell testified that he lived in a twenty-eight foot trailer in an RV park. (R. 44). His daily activities included waking up at 6 a.m., going fishing for thirty to forty-five minutes, and basically keeping to himself. (R. 43-45). He did not do yard maintenance, house keeping, laundry, grocery shopping or any kind of social activity because he did not enjoy being around a lot of people. (R. 44-45). He testified that he smoked about half a pack of cigarettes a day and drank about a six-pack of beer a week. (R. 46).

Campbell's medical records show that on December 7, 2004, he underwent a screening for depression and PTSD[2] at the VA Medical Center in Oklahoma City, Oklahoma. (R. 310). The results were negative for depression and PTSD. *Id*.

On March 3, 2005, Campbell attended a consultative examination at the same VA Medical Center. (R. 305). The report from this visit stated that his attention span, concentration, and memory were all normal. (R. 307). He was also reported to have fluent speech, and he was able to express and recognize emotional gestures. *Id*.

Campbell once again tested negative for PTSD at the VA Medical Center on October 11, 2005. (R. 253). However, a PTSD test on November 17, 2006, showed that he was positive for the disorder. (R. 236). After being informed of the results, Campbell stated that he did not wish to meet with a mental healthcare provider. *Id*. At a subsequent appointment on February 16, 2007,

---

[2]Posttraumatic Stress Disorder (PTSD) is defined as "the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member or other close associate." American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorder*, p. 463, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000.

Campbell tested negative for depression after being screened at the VA Medical Center. (R. 226).

Campbell visited the VA Medical Center again on February 27, 2008, where he underwent various assessments. (R. 613). Campbell's education level was assessed to be a ninth through twelfth grade level, and no barriers to his learning capabilities were identified. (R. 614). He was once again screened for depression and PTSD, and tested negative for both. (R. 615).

On August 13, 2008, Campbell was required to attend an orthotics consult after having a procedure done on his wrist. (R. 493). During the meeting, Dr. Jonathan Cruse explained to Campbell the proper procedure for taking care of his wrist. *Id*. In his report, Dr. Cruse noted that "[n]o barriers to learning or understanding were identified." *Id*.

Campbell had a psychological evaluation done by Dr. Jeri Fritz on August 6, 2007. (R. 372). Dr. Fritz noted that during his schooling, Campbell was very athletic and therefore did not spend much time in the classroom. *Id*. Campbell informed Dr. Fritz that his educational experience had been mostly negative because of the racial tension in his school and because his sports coaches would pass him so that he would be permitted to play multiple sports. *Id*. This led to Campbell dropping out of school in the eleventh grade and joining the military. *Id*.

As summarized by Dr. Fritz, Campbell's mental health history showed that he had a bad temper, and did not like people aggressively touching him, but he had never been in therapy. (R. 629). He had been taught to never start fights, but to also never walk away from them. *Id*. Dr. Fritz noted that Campbell's record showed he had signs of PTSD, but that Campbell did not indicate any significant stress from events that could trigger this disorder. *Id*. Campbell related a specific instance of trauma that occurred when he was in the military, but he informed Dr. Fritz that he did not have suicidal or homicidal thoughts, hallucinations, or delusions, and he did not have a history

4

of physical or sexual abuse. *Id*.

In Dr. Fritz's observations of Campbell during the assessment, he stated that Campbell did not appear to be in distress and seemed animated in his conversation. *Id*. He found Campbell's behavior to be socially appropriate and cooperative, and Campbell was able to follow verbal and written directions. (R. 629). He also noted that there was "no evidence of psychotic thought, such as loose associations, tangentiality, or obvious cognitive distortions." (R. 373).

Dr. Fritz noted that Campbell was alert, and his immediate registration and long-term memory appeared normal. (R. 630). Campbell's short-term memory was considered impaired because he could only remember one of three objects in five minutes. *Id*. He could recall the current president and the two preceding presidents, and he could spell the word "world" in both normal and reverse order. *Id*. Dr. Fritz stated that Campbell's attention and concentration were intact, he was aware of social norms and conventions, and he had the capacity for good judgment. *Id*. His responses to other questions showed that he did not have abstract cognition, but his insight was noted as fair, and he was able to interpret proverbs. *Id*. Dr. Fritz also gave Campbell a Folstein Mini-Mental Status exam, on which Campbell scored 26 out of 30, indicating no organic impairment. *Id*.

Dr. Fritz found Campbell's intellect to be within the low average range of functioning. *Id*. His concentration and attention levels were normal, and he was able to perform simple, repetitive tasks. *Id*. Dr. Fritz believed Campbell's learning disability claim was unsubstantiated and that Campbell's learning skills were most likely weakened because he was allowed to miss class and his coaches passed him so he could play sports. *Id*.

A Psychiatric Review Technique form was completed by Dr. Carolyn Goodrich, an agency non-examining consultant, on August 15, 2007. (R. 376). Dr. Goodrich found that Campbell did

not have any medically determinable impairment, and was therefore not in need of a Mental Residual Functional Capacity Assessment. *Id*. Dr. Goodrich wrote in the consultant's notes that Campbell lived with his girlfriend, drove, shopped, paid bills, fished, and avoided other people. (R. 388). She also noted that a CT scan of Campbell's head showed no significant abnormalities besides more atrophy than normal for a man his age, and that he had a positive screening for alcohol abuse in 2004, but declined treatment. *Id*. She concluded by stating that Campbell did display limitations, but these limitations seemed to be caused by physical impairments and pain. *Id*.

## Procedural History

Campbell filed an application on April 26, 2007 seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq*. (R. 148). Campbell alleged onset of disability as January 15, 2004. *Id*. The application was denied initially and on reconsideration. (R. 58). A hearing before ALJ Richard J. Kallsnick was held March 31, 2009 in Tulsa, Oklahoma. (R. 27). By decision dated April 17, 2009, the ALJ found that Campbell was not disabled. (R. 15). On May 14, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security

regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[3] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither

---

[3]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Campbell's date last insured was December 31, 2007. (R. 15). At Step One, the ALJ found that Campbell had not engaged in any substantial gainful activity during the relevant period, which was after Campbell's alleged onset date of January 15, 2004 through the date last insured, December 31, 2007. (R. 17). At Step Two, the ALJ found that Campbell had severe impairments of cervical degenerative disc disease and carpal tunnel syndrome of the right wrist. *Id*. The ALJ discussed Campbell's allegations of cirrhosis of the liver, hypertension, high cholesterol, lung problems, sleep disorder due to chronic pain, heart disease, knee problems and post traumatic stress disorder (PTSD), but noted that these impairments were considered non-severe because the evidence established they would have no more than a minimal effect on Campbell's ability to work. *Id*. At Step Three, the ALJ found that Campbell's impairments did not meet any Listing. *Id*.

In his RFC determination, the ALJ found that Campbell had the RFC to perform the full range of light work limited to only occasional overhead reaching. (R. 20). At Step Four, the ALJ found that Campbell could not return to his past relevant work as a construction worker. (R. 25). At Step Five, the ALJ noted that Campbell "has a limited education and is able to communicate in English." *Id*. The ALJ found there were a significant number of jobs in the national economy that Campbell could perform considering his age, education, work experience, and RFC. *Id*. Therefore, the ALJ found that Campbell was not disabled during the relevant period between the alleged onset date and the date last insured. (R. 26).

**Review**

Campbell raises one issue on appeal, arguing that "[t]he ALJ erred by failing to resolve conflicts between the vocational expert testimony and the Dictionary of Occupational Titles." Plaintiff's Brief, Dkt. #22, p. 3. The undersigned finds Campbell's arguments related to this one raised point of error to be unpersuasive. The Court therefore finds that the ALJ's decision is supported by substantial evidence and is legally sufficient, and the decision is affirmed.

On its surface, the issue Campbell raises of asserted conflicts between the testimony of a vocational expert ("VE") and the Dictionary of Occupational Titles (the "DOT") is not a novel one. At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account his age, education, work experience and RFC. *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999). The ALJ is allowed to do this through the testimony of a VE. *Id.* at 1089. In *Haddock*, the Tenth Circuit ruled that an ALJ must elicit testimony from a VE regarding whether the VE's testimony conflicts with the DOT. *Id.* at 1089-92. If there is a conflict, the ALJ must investigate it and elicit a reasonable explanation for the conflict before he can rely on the testimony of the VE. *Id.* at 1091-92.

Within this larger issue of conflict between the DOT and VE testimony, however, Campbell makes a narrow argument that apparently has not been addressed directly by the Tenth Circuit. Campbell asserts that the ALJ found that he was an individual "limited in his ability to read, write, and use numbers." (R. 50). He therefore asserts that the DOT jobs identified by the VE were not jobs that he could perform because they require "language development" at a level higher than this finding of limited ability to read and write. He asserts that this is a conflict

between the VE's testimony and the DOT that requires reversal.

There are many problems with Campbell's argument. The first is that he cited no authority for his argument that a finding of limited ability to read and write necessarily equates to a level of language development as that term is used in the DOT. As the Tenth Circuit has noted, "[a] party's failure to cite any authority 'suggests either that there is no authority to sustain its position or that it expects the court to do its research.'" *Flores v. Astrue*, 246 Fed. Appx. 540, 543 (10th Cir. 2007) (unpublished), *quoting Rapid Transit Lines, Inc. v. Wichita Developers, Inc.*, 435 F.2d 850, 852 (10th Cir. 1970). The undersigned has found no authority in this circuit to support an argument that a limited ability to read and write necessarily conflicts with certain levels of language development described in the DOT.

A second problem with Campbell's argument is that the ALJ did not actually make a finding of "limited ability to read and write." Campbell quotes this language in his argument because the ALJ used it in his hypothetical questions to the VE. (R. 50-53). The ALJ did make a finding that Campbell "has a limited education and is able to communicate in English." (R. 25). The ALJ cited to 20 C.F.R. § 404.1564 in this finding, and that regulation includes a provision that an individual with a seventh to eleventh-grade education is presumed to have a limited education. *See also Cosper v. Apfel*, 229 F.3d 1162 (10th Cir. 2000) (unpublished) (substantial evidence supported the ALJ's finding that the claimant had a limited education and could perform the jobs identified by the VE).

The undersigned finds that substantial evidence supported the ALJ's finding of a limited education. Substantial evidence also supported the ALJ's omission of the wording of a limited ability to read and write. Campbell completed the eleventh grade. (R. 34). While he testified

10

that he attended special education classes, he also testified that he could read and write. (R. 34-35). He qualified that testimony somewhat by saying that he could only spell small words and had to have big words read to him. *Id*. He served, apparently successfully, in the military. (R. 35-36). He worked for 26 years in the construction industry. (R. 36-38). His VA medical records include findings of fluent speech and of a ninth to eleventh-grade education level. (R. 307, 614). Those records also noted twice that "no barriers to learning" were identified. (R. 493, 614). The examining consultant who completed a psychological evaluation found Campbell to have no problem following written directions. (R. 629). Campbell's intellectual functioning was deemed to be in the low average range. *Id.* All of this was substantial evidence that supported the ALJ's omission of language stating that Campbell had a limited ability to read and write. Campbell's argument fails because it relies upon the mistaken premise that the ALJ made a finding of limited ability to read and write, when he in fact did not. *See, e.g., Barrett v. Astrue*, 340 Fed. Appx. 481, 488-89 (10th Cir. 2009) (unpublished) (no error where ALJ's decision expressly excluded mental impairment that had been included in hypothetical to VE).

Additionally, the Court finds that Campbell's argument is not completely accurate from a factual standpoint regarding the language development requirements of the jobs identified by the VE. The VE testified to three representative light jobs: 1) office cleaner, DOT 323.687-014; 2) press machine operator, DOT 685.686-010; and 3) light production inspector, DOT 559.687-074. (R. 52). 1991 WL 672783; 1991 WL 678281; 1991 WL 684563.

In his brief, Campbell ignores the office cleaner job, which has a language development level of 1. 1991 WL 672783. The DOT number of the second job identified by the VE as a press

machine operator actually corresponds to a job named fringing machine operator.[4] 1991 WL 678281. It does have a light exertional requirement, and it has a language development level of 1. The third job identified by the VE as a light production inspector is named inspector and hand packager by the DOT. 1991 WL 683797. It requires light exertion and has a language development level of 2. Thus, two of three of the DOT numbers given by the VE correspond to jobs that only require a language development level of 1, while Campbell's argument depends on his assertion that there is a conflict between a limited ability to read and write and language development level 2. The undersigned is not convinced that there would be a conflict, even if the ALJ had made a finding of a limited ability to read and write, and Campbell has not cited to any authority stating that there is a such a conflict. The undersigned is not required to make a finding regarding language development level 2, however, since two of the jobs identified by the VE only require language development level 1. The factual basis that Campbell relies upon for his argument regarding a conflict between the testimony of the VE and the DOT does not exist, and therefore his argument fails.

Campbell's argument is also weakened by the fact that his past relevant work as a construction worker and carpenter may have required a language development of 3, and he performed this work from 1978 to 2004. (R. 36). The Commissioner suggests that the correct DOT entry for Campbell's previous work would be 869.664-014, and it does correlate with the specifics that the VE gave. 1991 WL 687601; R. 50. Therefore, it is possible that Campbell's

---

[4]Campbell argues that the difference in the title of the job is a conflict that needs to be investigated by the ALJ and that requires reversal. Even if the press machine operator job were excluded due to the difference in the title, the other jobs would still supply the ALJ's decision at Step Five with substantial evidence, and this Court would still affirm.

own work history undermines his argument that his language skills were so limited that he could not perform jobs requiring language development levels of 2. There was substantial evidence to support the ALJ's Step Five finding that, considering Campbell's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers that Campbell could perform.

Campbell is correct that the ALJ did not ask the VE if her testimony was consistent with the DOT, and the ALJ should have made this inquiry. *Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th Cir. 2009). In *Poppa*, the Tenth Circuit reviewed the claimant's arguments that the VE's testimony conflicted with the DOT, and the court rejected those arguments. *Id.* at 1173-74. "Because there were no conflicts between the VE's testimony and the DOT's job descriptions, the ALJ's error in not inquiring about potential conflicts was harmless. *Id.* at 1174. In the present case, there are multiple reasons for this Court to conclude that there were no conflicts between the VE's testimony and the DOT job descriptions. Therefore, the error of the ALJ in not making an inquiry regarding potential conflicts was harmless.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 24th day of August, 2011.

_____
Paul J. Cleary
United States Magistrate Judge